SEIBERT CYLINDER OIL-CUP Co. *v.* DETROIT LUBRICATOR Co.

(*Circuit Court, E. D. Michigan.* February 14, 1888.)

1. PATENTS FOR INVENTIONS—WHO ARE INFRINGERS—LICENSEES.
   A contract whereby complainant agrees not to sue defendant for any future infringements of its patent, in consideration of defendant's accounting for machines manufactured and paying a royalty thereon, is in substance and effect a license, and complainant cannot treat defendant as an infringer by reason of its refusal to account and pay royalties.

2. SAME—LICENSE—BREACH OF CONTRACT—INJUNCTION.
   Where complainant had consented that a third party should enter upon the manufacture of its machines, in competition with its own licensee, to whom it had given certain exclusive rights, and such competition had resulted in a large reduction in the price of the machine, *held,* that whether such a consent was a technical violation of its contract with the licensee or not, complainant was not entitled to a preliminary injunction.

(*Syllabus by the Court.*)

In Equity. On motion for a preliminary injunction.

This was a bill to recover damages for an infringement of letters patent No. 138,243, issued April 29, 1873, to John Gates, for an improvement in lubricators. The bill contained the usual allegations of the issuance of the patent, its assignment to plaintiff, proceedings in various suits, in which the validity of the patent was several times adjudicated, and the infringement by the defendant, against which an injunction was prayed. The bill then proceeded to set forth (paragraph 9) that the defendant wrongfully pretended that it had a right to make, use, and sell the said invention by reason of a contract between the plaintiff and defendant, made on the 1st of December, 1883, in which it was agreed that neither party should sue the other under any of the patents now or hereafter owned by them; but in answer to this it was averred that this agreement had been rescinded, and that such rescission was caused by the wrongful act and default of the defendant in failing to make certain returns and pay certain royalties stipulated therein, and for such neglect and refusal, and because of the repudiation by the defendant of the agreement, the plaintiff had elected to rescind it, and that the infringement

complained of was committed subsequent to such rescission. It was further averred that even if said agreement had not been rescinded, the covenant not to sue was no bar to this suit, because the defendant had not observed and performed the covenants contained in such agreement in refusing to make the returns and pay the royalties stipulated therein. The answer admitted the use of the Gates patent by the defendant, and relied upon the agreement mentioned in the bill, which was claimed to be still in force. A copy of the agreement was annexed to the answer. After reciting in substance that the plaintiff was the owner of certain patents granted to Gates, among them the one in suit, for sight-feed lubricators, and that the defendant was the owner of certain other patents to Charles H. Parshall and George H. Flowers for rival inventions, and that contentions had arisen between the parties, growing out of infringements by each of the patents belonging to the other, and the pendency of a suit in the United States circuit court at Boston, wherein the Seibert Company was plaintiff, and one Burlingame, an alleged agent of the Detroit Company, was defendant, and also a certain other suit in the United States court at Detroit, wherein the Detroit Company was plaintiff, and certain vendees of the Seibert Company were defendants, it was agreed that judgment should be entered for the plaintiff in each of such suits, and that full satisfaction of each of said judgments should be duly entered of record in each case. It was further agreed that neither party should make use of the agreement by advertising or otherwise making the same public, so as to injure the business of the other, and that if any part was made public, the whole should be made public; that the agreement should not be exhibited, or a copy be furnished to any one. Following this was the following covenant:

"And so long as the covenants and agreements to be observed and performed by the parties respectively are observed and performed, each party agrees not to sue or directly or indirectly authorize to be sued the other party, its agents or vendees, under any of the letters patent now or to be hereafter owned by it. * * * And it is further agreed that neither party shall imitate the styles or shapes of the lubricators made by the other party."

Following this was a recital that the Seibert Company was the owner of a number of letters patent granted to Nicholas Seibert, which it was claimed the defendant was infringing, which charge of infringement the Detroit Company disputed; and after reciting that it was expedient to settle said disagreement "in consideration thereof, and of a full release by said Seibert Co. from all alleged future infringements of said patents by said Detroit Co., its agents or vendees outside of the New England states, the said Detroit Co. agrees, so long as the covenants and agreements to be performed by said Seibert Co. are performed by it, and so long as this agreement remains in force, to report to the treasurer of the Seibert Co." every month the number of lubricators made and sold by it, and within 10 days thereafter remit a royalty for each lubricator made and sold during the preceding month; "and in consideration thereof, said Seibert Co. agrees not to molest by suit or otherwise said Detroit Co., its agents or vendees, for any alleged infringement of said Nicholas

Seibert patents." Following this were a number of agreements and covenants, none of which were material except those numbered 17 and 19, in the copy of the agreement annexed to the answer, which were as follows: "(17) And said Seibert Co. agrees not to authorize the use of said Nicholas Seibert patents outside of the New England states, except as above." "(19) This agreement shall be binding upon the parties hereto, their respective successors and assigns, and shall continue in force during the terms, respectively, for which said Seibert patents were granted." The answer further claimed a breach of this agreement in the fact that plaintiff had, contrary to its stipulation not to authorize the use of said Seibert patents' outside the New England states, contracted with a New York corporation, known as the "Nathan Manufacturing Company," which had made constant use of the sight-feed, and had entered into a sharp competition with the defendant in selling railroad lubricators all over the United States, and that in consequence the defendant had been obliged to reduce its prices to meet the reduction in the price of complainant; that its sales had been much diminished from what they otherwise would have been; and that in consequence it had suffered many thousand dollars damages, which defendant claimed to recoup against the plaintiff's claims for the royalties. The contract with the Nathan Company, which was made February 3, 1885, was substantially as follows: The Seibert Company, for the purpose of extending the manufacture and sale of lubricators outside the New England states, appointed the Nathan Company its manufacturing and selling agent, subject to and in conformity with any existing contracts for the introduction and sale of lubricators to railroads only in the United States, other than the New England states, now binding on the party of the first part, which contracts the party of the second part has examined and understands; the Seibert Company not to be prevented thereby from making and selling, and the Nathan Company agreeing to manufacture and sell locomotives and air-brake lubricators as such agents; the agency to be revocable at any time by 12 months' notice; the Nathan Company to solicit and fill orders, to assume the entire expense, to collect the bills, and to account from time to time, retaining a commission according to a scale provided; and the Nathan Company is to be and shall represent itself as manufacturing and selling agent of the Seibert Company for the said lubricator business to railroads.

C. J. Hunt, J. H. Raymond, and Edmund Wetmore, for plaintiff.

A. P. Hodges and Charles A. Kent, for defendant.

BROWN, J., (after stating the facts as above.) This case turns largely upon the construction to be given the agreement between the plaintiff and defendant, and upon the further question whether, regarding the refusal of the defendant to make returns and pay royalties upon the Seibert patents as unlawful, the plaintiff was authorized to treat the contract as rescinded, and sue for an infringment of its patent. Upon a careful reading of this contract, it is quite evident that its purpose was to adjust two controversies between the parties.

The *first*, contained in **paragraphs 1 to 7**, inclusive, relates to two suits between the parties at Boston and Detroit, with respect to the Gates and Flowers and Parshall patents, and the terms upon which each party should be permitted to use the patents of the other. As bearing upon these the contract provided: (1) That judgments and satisfaction of the same should be entered in both suits; (2) that the agreement should not be used by either party, by advertising or otherwise making the same public, so as to injure the business of the **other party**; (3) that the agreement should not be exhibited, or a copy furnished to any person; (4) that neither party should imitate the styles or shapes of the lubricators made by the other party. It was further provided in paragraph 6, that "so long as the covenants and agreements to be observed and performed by the parties respectively are observed and performed, each party agrees not to sue, or directly or indirectly authorize to be sued, the other party, its agents or vendees, under any letters patent now or hereafter to be owned by it."

The *second* controversy relates to the alleged infringement by the defendant of the Seibert patents, and this part of the agreement was intended to settle the terms upon which the defendant should be permitted to make and sell these in the future. These terms were that, so long as the covenants and agreements to be performed by the said Seibert Company were performed by it, the defendant should report monthly the number of lubricators manufactured and sold, and should pay a royalty thereon. The contract contained a number of other covenants, (paragraphs 12 to 20,) most if not all of which refer to the Seibert patents alone, though it is possible that Nos. 12, 19, and 20 might be construed as referring to both series of patents.

There is evidently nothing in the two judgments which would bar a subsequent suit by the plaintiff against the defendant, for an infringement of the Gates patent. The suit against Burlingame, of which the defendant had assumed the defense, had passed to a judgment in favor of the plaintiff. This established the validity of the Gates patent as against the defendant, and in the absence of the covenant contained in paragraph 6, we see nothing to prevent the plaintiff from suing for any subsequent infringement of this patent. The judgment in the suit against Metcalf, at Detroit, of which suit plaintiff had assumed the defense, established the validity of the Flowers and Parshall patents as against the plaintiff, but the validity of these patents was not necessarily inconsistent with that of the Gates patent; in fact, the Flowers patent is now admitted to be an improvement upon the Gates. Paragraph 6, however, interposes an obstacle to the prosecution of any suit so long as each party respectively observed its own covenants and agreements. We were at first inclined to the opinion that this paragraph referred only,—so far as respects the plaintiff,—to the Gates patent; but the covenant being not to sue "under any of the letters patent now or hereafter to be owned by it," the inference is strong that all of the patents named in the agreement were intended to be included. In this case the covenants and agreements mentioned in the paragraph must be given an equally broad

interpretation, and held to include not merely those which preceded and were included in paragraph 6, but also those contained in the paragraphs relating more particularly to the Seibert patents. At the same time it seems very singular that while the parties apparently intended to relinquish all remedy for non-payment of royalty on the Seibert patents, by suit upon those patents, they should reserve the right, if such royalties were not paid, to bring suit upon the original Gates patent. For a non-payment of the royalty upon the Seibert patent, it would have been much more natural to reserve the right to sue upon those patents, rather than upon the Gates patent, and the inference is very strong that it was intended, by the entry of mutual judgments upon the Gates and Flowers and Parshall patents, to give each party the right to deal with these patents as if they belonged to it. Had paragraph 6 terminated with the words, "under any of the said letters patent," the inference would be irresistible that it was intended to apply only to those which had been previously mentioned. Notwithstanding the broad language, "under any letters patent now or hereafter owned by it," we still entertain a grave doubt, arising from the connection in which these words are used, whether the refusal to pay royalties upon the Seibert patents was ever intended to authorize a suit upon the Gates patent.

Indeed, the proper construction of this contract is enshrouded with difficulties. One thing, however, is entirely clear. It was never intended to authorize a suit upon either the Gates or Seibert patents, so long as monthly statements were made, and the royalty upon the Seibert patents promptly paid. Conceding that the covenant not to sue, contained in paragraph 6, following the description of the Gates patent, is discharged by the refusal of the defendant to pay royalties upon the Seibert patents, if these covenants amount to a license to use the Seibert patents upon those terms, it is impossible to distinguish this case from that of *Hartell* v. *Tilghman*, 99 U. S. 547, in which it was held by a majority of the supreme court that a patentee has no right to treat a license as a nullity, and charge the defendant as an infringer. This was also a suit in equity for the infringement of a patent. The bill set out, not a license in terms, but a contract with the defendant for the use by the latter of plaintiff's invention. It charged that defendants paid him a considerable sum for the machines necessary in the use of the invention, and also paid the royalty for several months for the process secured by the patent. It further alleged that after defendants refused to do certain other things charged to have been a part of the contract, plaintiff forbade them further to use his patent process, and sought to charge them as infringers. As in this case, the defendants admitted the validity of the plaintiff's patent, their use of it, and their liability to him for its use under the contract. They set out in a plea the contract as they understood it, and the tender of all that was due to the plaintiff under it, and their readiness to perform it. Although a license was tendered, none was ever signed. The court held that the suit was not one arising under the patent laws, and that plaintiff's only remedy was to sue for his royalty as often as the same became due, bring a suit in equity for

a specific performance, or seek to have the contract annulled and set aside. It was held, however, that plaintiff had no right in himself to abandon the contract, to treat it as a nullity, and to charge the defendants as infringers. "We do not agree," says the court, "that either party can of his own volition declare the contract rescinded, and proceed precisely as if nothing had been done under it. If it is to be rescinded, it can be done only by a mutual agreement, or by the decree of a court of justice. If either party disregards it, it can be specifically enforced against him, or damages can be recovered for its violation. But until so rescinded or set aside, it is a subsisting agreement which, whatever it is or may be shown to be, must govern the rights of the parties in the use of complainant's process, and must be the foundation of any relief given by a court of equity." The case holds in substance that the contract between the plaintiffs and defendants amounted to a license, which neither party could revoke at pleasure; and that plaintiff had no right to treat the defendants as infringers simply by reason of their refusal to pay the stipulated royalties. It must be regarded as practically overruling *Brooks* v. *Stolley*, 3 McLean, 523, and *Cohn* v. *Rubber Co.*, 3 Ban. & A. 572.

Now, if a covenant not to sue for future infringements in consideration either that the covenantee shall permit the covenantor to make use of his patent, or that the covenantee shall make returns and pay royalties upon patents owned by the covenantor, be not a license, it is difficult to characterize it. No particular form of words is necessary to constitute a license. Anything which confers upon another the right to do an act, which without such act would be illegal, is sufficient for that purpose. It may be given in express terms, or implied from the conduct of another without the use of any words at all. Mr. Walker, in his work upon Patents, defines a license to be a conveyance of a right under a patent, which does not amount to an assignment or a grant. Section 296. Indeed, mere acquiescence, if founded upon a valuable consideration, is sufficient of itself to amount to a license. It is well settled that a covenant not to sue a debtor operates as a release of the debt, and I see no reason to doubt that a general covenant not to sue for future infringements is as complete a license as if permission were formally given by a written instrument to that effect. That a bill will not lie to annul a license where the only material allegation is that the licensee failed to make a report of his manufactures and sales and pay royalty, was decided in *Densmore* v. *Tanite Co.*, 32 Fed. Rep. 544, and that plaintiff cannot in such case sue for an infringement was also held in *Purifier Co.* v. *Wolf*, 28 Fed. Rep. 814.

As the circuit court has jurisdiction of this case by reason of the diverse citizenship of the parties, we do not undertake to say that we might not entertain jurisdiction of a suit to annul and cancel the agreement, as indicated in *Hartell* v. *Tilghman*.

But again, irrespective of the question of a final recovery under this bill, we think the plaintiff has not made such a case as entitles it to a preliminary injunction. By the seventeenth paragraph of the agreement

it covenants not to authorize the use of the Seibert patents outside of the New England states. Whether in violation of this covenant or not, it entered into another contract with the Nathan Company, under which the latter has embarked in the manufacture and sale of lubricators, and, as clearly shown by the affidavits, the rivalry between the parties has become so fierce that the price has been reduced from $50 to $60 a set to $20 or $23. In other words, the value of defendant's monopoly (and it was evidently intended by the contract to give it a monopoly outside of the New England states) has been practically destroyed by the act or connivance of the plaintiff. Under these circumstances, as there is no question made with regard to the defendant's responsibility, we think the court cannot properly be called upon to enjoin in a summary way the further continuance of defendant's business.